**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
Case No. 98-2901-CIV-UNGARO-BENAGES

DIANA J. BRYAN,
    Plaintiff,

vs.

HOOTERS OF BAYSIDE, INC.,
    Defendant.
_____/



FILED by _____ D.C.

**JUN 2 9 2000**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS CAUSE is before the Court upon Defendant's Motion for Summary Judgment, filed November 5, 1999.

THE COURT has considered the Motion, the pertinent portions of the record and is otherwise fully advised in the premises.

### FACTS[1]

In January 1995, Plaintiff Diana Bryan ("Bryan") was hired to work as a server and hostess at Defendant Hooters restaurant in Bayside ("Hooters at Bayside"). Deposition of Diana Bryan ("Bryan Depo.") at 6, 10. Upon commencement of Bryan's employment, Hooters provided her with a copy of "Hooters' Non-Harassment Policy" (the "Policy"). Exhibit 1 to Defendant's Appendix in Support of its Motion for Summary Judgment ("Def. App."). The Policy prohibits sexual harassment, including unwelcome sexual advances or requests for sexual favors and verbal or physical conduct of a sexual nature when submission to or rejection of the conduct is made a term or condition of employment or unreasonably interferes with work performance. Exhibit 6 to Def. App. The Policy provides that immediate action will be taken to

_____

[1]Unless otherwise noted, the material facts are undisputed or viewed in the light most favorable to Plaintiff.

investigate complaints, and where practicable, complaints will remain confidential. Id. Additionally, the Policy provides the names and telephone numbers of five individuals who could be contacted to report harassment. Id. Bryan was aware that the list containing the names and telephone numbers of the individuals who could be contacted to report harassment was posted on the back of the office door. Bryan Depo. at 85-86.

During most of Bryan's employment, Alan Engle ("Engle") and Mike Pemberton ("Pemberton") were assistant managers at Hooters at Bayside. Defendant's Statement of Undisputed Facts in Support of its Motion for Summary Judgment ("Defendant's SUF") at 2. According to Bryan, between January 1996 and December 1997, both Pemberton and Engle made sexually inappropriate comments and advances. Bryan Depo. at 37, 41; Deposition of Alan Engle ("Engle Depo") at 30. Specifically, Engle told Bryan on five separate occasions that her breasts were as "beautiful as a baby's bottom." Id. at 34. Additionally, Bryan went out after work with Engle and other co-workers on approximately three occasions. Id. at 153-54. During these outings, Engle became intoxicated and "[began] to hug and hang on everyone and kiss on everyone," including Bryan. Id. 153. With respect to Pemberton, in February or March 1997 and December 1997, Pemberton called Bryan at home between three and five times. In February or March, Pemberton called and asked if he could come over and, in December, asked if he could take Bryan to the company's Christmas party. Id. at 39-42. In all instances, Bryan resisted Engle's and Pemberton's overtures. However, she never reported their conduct to anyone at Hooters. Id. at 38, 42.

Sometime in 1996, Joe Upchurch ("Upchurch") became the general manager at Hooters at Bayside. Defendant's SUF at 2. Almost immediately, Upchurch began making changes. For

2

example, Upchurch began rotating the shift assignments so that all of the qualified servers had an opportunity to work the outside and bar areas of the restaurant, areas considered more lucrative than the inside areas and hostess position.  Deposition of Jennifer Piercy ("Piercy Depo.") at 5; Bryan Depo. at 61-62; Deposition of William Becker ("Becker Depo.") at 30.  Additionally, just before Christmas 1996, Upchurch reduced the number of shifts for the full-time servers, including Bryan, and distributed the available shifts among her co-workers.  Bryan Depo. at 21. Around this same time, Upchurch was contemplating a lengthy suspension for Bryan due to several unpleasant incidents and, to that end, summoned Bryan to a meeting to discuss her poor work attitude.  Id. at 25.  At the meeting, Upchurch described an incident in which Bryan had refused to comply with Engle's order that she bus the tables for another server and explained that Bryan needed to comply with instructions.  Id.  Additionally, Upchurch discussed reports he had received concerning Bryan's rudeness with customers.  Id. at 28.  Upchurch advised Bryan that she needed to have "thick skin" and not let the things that customers say bother her.  Id. at 27. Bryan agreed to change her attitude and, in the end, Upchurch suspended her for only a week. Id. at 26-27.

Bryan thereafter felt that Upchurch was unduly hard on her.  Id. at 47-49.  For example, sometime between January and March 1998, after Upchurch broke up an altercation between Bryan and another server while the two were working at the inside bar, Bryan complained to Lori Ballard ("Ballard"), a Hooters manager, that Upchurch was unfairly banning her from working any bar shifts  Id. at 43-44, 59; Deposition of Farrah Yaden at 7-8.  Around this same time, Bryan also complained that Engle had stopped scheduling her for bar shifts because, according to Engle, she "didn't appreciate them" and that the servers who were dating or socializing with the

3

managers received the better shifts. Id. at 86, 94-96. Ballard advised Bryan to speak to someone in upper management. Id. at 96.

In March 1998, Bryan wrote Hooters owner David Lageschulte ("Lageschulte") detailing what she characterized as "really bad harassment." Exhibit 3 Defendant's App.; Defendant's SUF at 3; Plaintiff's SUF at 5. In the letter, Bryan complained that Upchurch and the other managers gave better shift assignments to the servers with whom they had sexual relationships or with whom they socialized after work. Bryan also complained that Upchurch made nasty comments to the servers. Specifically Bryan recounted an incident during which she told Upchurch that she had a bladder infection and Upchurch responded, in front of others, "If you take care of your cooter, your cooter will take care of you." Bryan further complained that she found the new Hooters comic book and the t-shirt provided to pregnant servers offensive.[2] Finally, Bryan reported that the managers refused to address "customer misbehavior." Exhibit 3 to Defendant's SUF.

With respect to customer misbehavior, Bryan claimed in her letter that Pemberton refused to take any action against a customer who had asked her if she was wearing any underwear and cursed at her. Bryan also alleged that the managers refused to intervene when she complained about customers videotaping her breasts and buttocks and instructed her to let customers put their arms around her when taking photographs. Bryan further advised Lageschulte that she was punished by being given hostess shifts whenever she complained about inappropriate customer

---

[2]The Hooters comic book depicted the fictional Hooters servers with large breasts, small waists and big hair and one of characters as dim-witted. Engle Depo. at 44. The comic book was sold for about a week before it was pulled due to Plaintiff's and other servers' complaints. Id. at 43. The t-shirt for pregnant servers read "I should have danced all night." Exhibit 3 to Defendant's App.; The t-shirt was made available to pregnant servers but was not required work attire. Deposition of David Lageschulte at 48.

4

behavior.  Exhibit 3 to Defendant's App.

In her deposition, however, Bryan testified that Pemberton in fact spoke to the customer who cursed at her and told him to leave.  Bryan Depo. at 101-02.  Bryan further testified that she did not remember any incident in which a manager refused to speak to a customer about objectionable videotaping.  Id. at 67.  Finally, Bryan testified that the managers never told her to let the customers put their arms around her when taking photographs but rather they encouraged her not to get upset about it when it happened.  Id. 103-04.  According to Bryan, she merely hoped that the letter would effect a change in Hooters at Bayside management and assignment of shifts irrespective of the server's romantic or social relationship with the manager in charge of scheduling.  Id. at 107.

Within a week of receiving Bryan's letter, Hooters management contacted her to arrange a meeting to discuss her complaints.  Defendant's SUF at 5.  On March 13, 1998, Bryan met with Hooters president Terry Brawner ("Brawner").  Brawner advised Bryan that her allegations would be investigated and if a problem was found, Hooters would take appropriate action.  Brawner also advised Bryan that Upchurch would be transferred.  Id. at 109-10.  Finally, Brawner told Bryan that if she had any additional complaints she should report them directly to him.  Id. at 116.  At the meeting's conclusion, Bryan told Brawner that she was pleased with his plan for addressing her complaints.  Id. at 117.

Shortly after the meeting, Brawner commenced an investigation that included interviews of other Hooters servers as well as a review of the shift assignment records.  Defendant's SUF at 5; Brawner Depo. at 41.  Additionally, Brawner transferred Upchurch to another Hooters location and ordered Pemberton to begin scheduling Bryan for additional outside and main bar shifts.

5

Brawner Depo at 38-39, 109. Brawner further advised Pemberton and William Becker, a member of Hooters management, that Bryan was to report any further problems directly to him. Id. Hooters also discontinued the sale of the comic book, removed the t-shirts from their merchandise and instituted a "no videotaping" policy.[3] Plaintiff's SUF at 6; Deposition of David Lageschulte ("Lageschulte Depo.") at 48; Engle Depo at 30.

In late April 1998, Brawner met with Bryan again, this time to discuss an incident in which she was accused of cursing at a customer after the customer bumped into her and spilled beer on her. Bryan Depo. at 118, 121; Exhibit 6 to Defendant's App. Although Bryan admitted that she told the customer to move out of her way, she denied cursing. Bryan Depo. at 123. Eric Feinblatt, a new assistant manager at Hooters at Bayside, investigated the incident and advised Hooters management that he did not believe Bryan's account. Exhibit 6 to Def. App. During their meeting, Brawner told Bryan that management did not consider her account credible and that if there were any further problems she would be fired. Bryan Depo. at 122. Before concluding the meeting, Brawner asked Bryan whether the issues they had discussed in their first meeting had been satisfactorily resolved. Id. at 123-24. Bryan told Brawner that she was happy with Hooters' response and other than requesting the scheduling of a meeting on sexual harassment, she had no other requests or complaints. Id. at 124.

Sometime in May 1998, after a new general manager was assigned to Hooters at Bayside, Bryan attended a staff meeting. Id. 124-25. Bryan believed that the meeting's purpose was to discuss staff complaints of sexual harassment. Id. at 125-26. However, when she attempted to

---

[3]Engle testified that the no videotaping policy was enacted before he left Hooters' employ in November 1997, at least four months prior to Plaintiff's letter to Lageschulte. Engle Depo. at 30.

6

discuss her complaints regarding preferential scheduling, Bill DePalo ("DePalo"), an area supervisor for Hooter's management company, explained that the meeting had not been called to discuss these issues and that her complaints should be dealt with on a personal basis. Id. at 126-27; Plaintiff's SUF at 10; Deposition of William DePalo ("DePalo Depo.") at 48; Deposition of Loretta DePass at 5; Deposition of Jennifer Piercy at 12-13. Despite DePalo's admonition, Bryan persisted in her attempt to discuss her complaints. DePalo Depo. at 48. Two days later, Brawner told Bryan that she was fired because she had been disruptive at the staff meeting and had contravened his express instruction to bring her complaints directly to him. Bryan Depo. at 130. On May 22, 1998, Bryan filed a Charge of Discrimination with the Equal Employment Opportunity Commission and the Florida Commission on Human Relations alleging sexual discrimination and retaliation. Complaint at ¶ 6.

## LEGAL STANDARD

Summary judgment is authorized only when the moving party meets its burden of demonstrating that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P 56. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The *Adickes* Court explained that when assessing whether the movant has met this burden, the court should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. *See Adickes*, 398 U.S. at 157; *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997)(citing *Adickes*).

The party opposing the motion may not simply rest upon mere allegations or denials of

the pleadings; after the moving party has met its burden of coming forward with proof of the absence of any genuine issue of material fact, the nonmoving party must make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrell,* 477 U.S. 317 (1986); *Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir. 1989).

If the record presents factual issues, the Court must not decide them; it must deny the motion and proceed to trial. *See Environmental Defense Fund v. Marsh,* 651 F.2d 983, 991 (5th Cir. 1981). Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *See Lighting Fixture & Elec. Supply Co. v. Continental Ins. Co.,* 420 F.2d 1211, 1213 (5th Cir. 1969). If reasonable minds might differ on the inferences arising from undisputed facts then the Court should deny summary judgment. *See Impossible Electronics Techniques, Inc. v. Wackenhut Protective Sys., Inc.,* 669 F.2d 1026, 1031 (5th Cir. 1982). *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)("[T]he dispute about a material fact is 'genuine,' . . . if the evidence is such that a reasonable jury could return a verdict for the non-moving party.").

Moreover, the party opposing a motion for summary judgment need not respond to it with evidence unless and until the movant has properly supported the motion with sufficient evidence. *See Adickes,* 398 U.S. at 160. The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied notwithstanding that the nonmoving party has introduced no evidence whatsoever. *See Brunswick Corp. v. Vineberg,* 370 F.2d 605, 611-12 (5th Cir. 1967). The Court must resolve all ambiguities and draw all justifiable inferences in favor of the

8

nonmoving party. *See Anderson*, 477 U.S. at 255 (1986).

## LEGAL ANALYSIS

As an initial matter, the Court notes that Bryan asserts claims of sexual harassment and retaliation under Title VII and the Florida Civil Rights Act (the "FCRA"). Because parallel claims under Title VII and the FCRA are subject to the same substantive standard, the following analysis will apply to Bryan's claims under both statutes. *See Waters v. City of Atanta*, 803 F.2d 1135, 1143 n.5 (11th Cir. 1986)(citing *Whiting v. Jackson State Univ.*, 616 F.2d 116, 121 (5th Cir. 1980)); *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998).

### I. Sexual Harassment

Bryan asserts a claim of sex discrimination based on theories of *quid pro quo* and hostile work environment sexual harassment. Hooters contends that the record fails to establish a *prima facie* case of sexual harassment on either theory. Hooters further contends that it has established that Bryan's claims are barred by the affirmative defense provided in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).

### A. Quid Pro Quo Sexual Harassment

To establish her *quid pro quo* sexual harassment claim, Bryan points principally to Upchurch's and Pemberton's practice of giving better shifts and more lucrative shift assignments to servers with whom they were having consensual sexual relationships. As Hooters argues, however, such conduct does not constitute *quid pro quo* sexual harassment unless coupled with evidence that a tangible employment action or job detriment resulted from a refusal to accede to a sexual demand. *See Burlington Ind., Inc. v. Ellerth*, 524 U.S. 742, 753 (1998); *Gupta v. Florida Bd. of Regents*, 2000 WL 633024, * 6 (11th Cir. 2000).

9

Bryan does not contend that Upchurch, Pemberton or any other manager explicitly demanded sexual favors in exchange for the more lucrative restaurant assignments.  Rather, Bryan argues that Engle and Pemberton *implicitly* demanded sexual favors in exchange for the better shifts and that her refusals were met with undesirable work assignments.  *See Henson v. City of Dundee*, 682 F.2d 897, 909 (11th Cir. 1982)(noting that acquiescence to the sexual demands must be an express or implied condition to the receipt of a job benefit or the cause of job detriment).

In this regard, Bryan points to Engle's rebuffed attempts to hug and kiss her during afterwork outings as well as Pemberton's declined requests to come to her home and to take her to a company Christmas party.  This conduct, however, is insufficient to establish *quid pro quo* sexual harassment absent some additional evidence suggesting that Engle and Pemberton used less desirable work assignments to penalize Bryan for rebuffing their advances and requests.  *See Gupta*, 2000 WL at 2 (noting that *quid pro quo* sexual harassment involves threats which are carried out or fulfilled).

With respect to Engle, Bryan testified that after she discontinued going out with Engle and the other servers in early 1997, Engle told her that "[she] didn't appreciate [her] shifts" and in August and the first two weeks of September 1997, stopped scheduling her for the preferred shifts and assigned her to a hostess position twice.  Bryan Depo. at 154-55; Engle Depo. at 14, 30; Pemberton Depo. at 7; Plaintiff's SUF at 3.  However, Bryan further testified that she understood Engle's comment about not appreciating her shifts to mean that "[she] didn't want to hang out with them and be a part of their little group in order to receive her shifts, [she] just wanted to work."  Bryan Depo. at 95.  Thus, even when viewed in the light most favorable to

10

Bryan, Engle's comment and subsequent pattern of assigning shifts to Bryan fails to support Bryan's contention that undesirable work assignments were used to penalize her for rebuffing an implicit sexual demand. Rather, Bryan's own deposition testimony demonstrates that Engle's comment and subsequent scheduling of Bryan was because she chose not to continue to participate in Engle's social clique, not to penalize her for rebuffing any sexual advance.

With respect to Pemberton, the record is similarly devoid of any evidence that Pemberton used less desirable shift assignments to penalize Bryan for rebuffed advances. Specifically, Bryan testified that Pemberton's calls to her home requesting to come over occurred in February or March 1997 and his request to take her to the company Christmas party occurred in December 1997. Bryan Depo. 39-42. However, Pemberton was not advised that he would be taking over scheduling responsibilities until October 1997, almost seven months after the phone calls in February or March. Pemberton Depo. at 7. Thus, with respect to the February or March 1997 requests to come over, there is no evidence from which a reasonable factfinder could conclude that Pemberton was intending to penalize Bryan if she did not acquiesce to his overtures. *See Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548, 1552 (11th Cir. 1997)(affirming summary judgment as to plaintiff's *quid pro quo* claim where there was no evidence that harasser possessed authority over terms of plaintiff's employment during the time the alleged sexual advances were made). Moreover, while Pemberton was in charge of scheduling at the time Bryan declined his request to take her to the company Christmas party, Bryan does not contend that Pemberton subsequently scheduled her for undesirable shifts.[4] Consequently, the Motion

_____

[4]In fact, a review of Bryan's schedule from December 15, 1997 until her termination reveals that Bryan was scheduled to work the bar areas fifteen times and the outside east tables five times. *See* Exhibit 10 to Def. App.

will be granted as to Bryan's *quid pro quo* sexual harassment claim.

B. <i>Hostile Work Environment</i>

To establish a claim of sexual harassment based on hostile work environment, Bryan must demonstrate: 1) that she belongs to a protected group; 2) that she has been subjected to unwelcome sexual harassment, such as sexual advances, requests for sexual favors and other conduct of a sexual nature; 3) that the harassment was based on her gender; and 4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment. *See Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1245 (11th Cir. 1999). Hooters contends that the allegedly harassing conduct is legally insufficient to demonstrate the requisite severity and pervasiveness and thus, Bryan's claim fails as a matter of law. Hooters further contends that even assuming the record contains such evidence, the record establishes that Bryan's claim is barred pursuant to the affirmative defense articulated in *Faragher.* The Court agrees with both of Hooters' contentions.

In support of her hostile work environment claim, Bryan points to the preferential shift assignments and the following additional conduct to demonstrate that she was subjected to an actionable hostile working environment: 1) Upchurch's comment to her that "if you take care of your cooter, your cooter will take care of you; 2) Engle's comments that her breasts were as "beautiful as a baby's bottom and his attempts to hug and kiss her; 4) Pemberton's three to five calls to her home during which he asked to come over and once asked to take her to a company Christmas party; 5) Hooters merchandising of a t-shirt for its pregnant employees which read "I should have danced all night" and sale of a comic book that depicted the fictional Hooters servers with large breasts and one of the characters as dim-witted; and 6) customer misbehavior,

12

such as instances of customers videotaping Bryan's breasts and buttocks and a customer's inquiry as to whether Bryan was wearing underwear and cursing at her after she became upset by the comment. This conduct fails to establish a hostile work environment claim for the following reasons:

### 1. Preferential Shift Assignments

Bryan contends that Hooters' management subjected her to a hostile work environment by giving preferential treatment to co-workers who were engaged in sexual relationships with the scheduling managers. However, as numerous courts have found, favoritism based only on consensual sexual relationships, such as asserted here, is not based upon the nonfavored employee's gender but rather is gender neutral and "more akin to nepotism" than sexism and thus fails to constitute actionable sexual discrimination. *See Elger v. Martin Memorial Health Sys., Inc.*, 6 F.Supp.2d 1351 (S.D. Fla. 1998)(quoting *Ayers v. American Tel. & Tel. Co.*, 826 F.Supp. 443 (S.D. 1993)); *Tucker v. Shalala*, 1998 WL 559760, *4 (D. Kansas 1998)(granting summary judgment on plaintiff's claim for hostile work environment based on a supervisor's preferential treatment of two subordinates with whom the supervisor was alleged to have a personal relationship)(citations omitted); *Mathews v. City of LaVerne*, 1997 WL 351073, *5 (C.D. Cal. 1997)("The law is clear regarding so called preferential paramour treatment. A co-worker's romantic relationship with a supervisor does not by itself create a hostile work environment."). *See also Womack v. Runyon*, 147 F.3d 1298, 1301 (11th Cir. 1998)(affirming dismissal where sole issue upon appeal was whether preferential treatment based on a consensual relationship between a supervisor and employee constitutes a cognizable sex discrimination claim under Title VII). Bryan has offered no evidence or argument which would distinguish these authorities from

13

the case at bar.  Accordingly, to the extent Bryan's claim is based upon preferential shift assignments being afforded to servers having consensual relationships with the managers, her claim fails.

In reaching this conclusion, the Court has considered that a hostile work environment claim may be established by evidence of preferential paramour treatment coupled with evidence that the work environment was permeated with sexually suggestive conduct between the paramours, or that the paramour relationships were coercive in nature.  *See Harris v. Forklift Sys.*, 510 U.S. 17 (1993)("[When the workplace is permeated with 'discriminatory intimidation, riducule and insult'. . ."that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated.")(quoting *Meritor Savings Bank v. Vinson*, 477 U.S. at 65, 67 (1986)); *DeCintio v. Westchester County Med. Ctr.*, 807 F.2d 304 (2nd Cir. 1986)(finding that Title VII's protections are not implicated where preferential treatment is extended to a consensual partner and distinguishing the claim that is based on the coercive nature of the supervisor's acts rather than the fact of the relationship itself).  In the instant case however, the record lacks a factual basis upon which a rationale factfinder could conclude that Bryan's work environment was permeated with any sexual innuendo or suggestive conduct between the identified managers and servers or that the relationships engaged in were coercive in nature.  In fact, none of the servers involved in these relationships testified that her participation was anything but voluntary.  *See* Deposition of Jennifer Piercy at 5; Deposition of Loretta DePass at 3.  Consequently, Bryan's claim of preferential shift assignments is not relevant to her hostile work environment claim.

## 2. Other Harassing Conduct

With respect to the remaining conduct, Hooters contends that the alleged harassing conduct was not sufficiently severe or pervasive to alter the terms and conditions of Bryan's employment and create an abusive working environment.  In determining whether conduct is sufficiently severe or pervasive, the relevant factors include: "1) the frequency of the conduct; 2) the severity of the conduct; 3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and 4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza*, 195 F.3d at 1246.

Another relevant factor can be the nature of the workplace.  *See Gross v. Burggraf Constr. Corp.*, 53 F.3d 1531,1537 (10th Cir. 1995).  In this case, the workplace is a Hooters restaurant, a restaurant/bar known more for the skimpy attire and robust appearance of its female servers.[5]  *See Rabidue v. Osceola Refining Co., A Division of Texas-American Petrochemicals*, 584 F.Supp. 419, 430 (E.D. Mich. 1984)("Indeed, it cannot seriously be disputed that in some work environments, humor and language are rough hewn and vulgar.  Sexual jokes, sexual conversations and girlie magazines may abound.  Title VII was not meant to–or can–change this.").  Therefore, in this case, the context in which the alleged offensive behavior occurred is highly relevant to the Court's consideration of whether a genuine issue exists concerning the severity and pervasiveness of the alleged objectionable conduct.  *See also Oncale v. Sundowner Offshore Svcs. Inc.*, 523 U.S. 75, 81 (1998)(""[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the

[5]A number of courts have noted Hooters' reputation with regard to its female wait staff.  *See, e.g., Bennett v. CompUSA, Inc.*, 1997 WL 10028, *1 (N.D. Tex. 1997)(noting Hooters' reputation as a "restaurant where well-endowed female servers dress in suggestive and tight-fitting clothing").

circumstances.' [A]s in all harassment cases, that inquiry requires careful consideration of the

social context in which particular behavior occurs and is experienced by its target."); *Faragher,*

524 U.S. at 788 (noting that the objective component of the "severe and pervasive" element

precludes "the ordinary tribulations of the workplace, such as the sporadic use of abusive

language, gender-related jokes, and occasional teasing" from implicating Title VII's

protections)(citation omitted).

With respect to the conduct that Bryan attributes to Upchurch, Engle and Pemberton, a

careful review of the record reveals that the incidents were completely unrelated, occurred

sporadically over at least a year period and although unwelcome, and in the case of Upchurch's

comment, rude and boorish, were neither physically threatening nor otherwise severe in nature.

Moreover, Upchurch was transferred almost immediately after Bryan complained about his

conduct and Pemberton's invitation to Bryan to the company Christmas party can only be

characterized as innocuous.  In any event, Bryan does not contend that Upchurch, Engle or

Pemberton's conduct 'made it more difficult for [her] to do her job.'  *Harris v. Forklift Sys., Inc.,*

510 U.S. 17, 25 (1993)(Ginsburg, J., concurring)(quoting *Davis v. Monsanto Chemical Co.,* 858

F.2d 345, 349 (6th Cir. 1988)).  *See Fleming v. Boeing Co.,* 120 F.3d 242, 246 (11th Cir.

1997)(affirming district court's grant of summary judgment where employee's conduct,

including touching plaintiff, gazing at plaintiff and making inappropriate remarks were not

severe or pervasive enough to create an objectively abusive or hostile work environment);

*Graham v. State of Florida, Dept. of Corrections,* 1 F.Supp.2d 1445, 1447-48 (M.D. Fla.

1998)(finding five phone calls during which plaintiff claimed sexual overtures, compliments on

physical appearance and requests for dates were made not sufficiently severe or pervasive to

16

establish hostile work environment).

With respect to the comic book and t-shirts, Bryan complained only that she found the comic book and t-shirts offensive. A "mere offensive utterance" is insufficient to constitute actionable conduct. *See Mendoza*, 195 F.3d at 1246. Moreover, the t-shirt was removed from Hooters' merchandise and, within a week of commencing its sale, the comic book was discontinued. Also, as with Upchurch, Pemberton and Engle's conduct, Bryan does not contend nor does the evidence support an inference that the comic book and t-shirts affected her job performance. *Harris*, 510 U.S. at 25.[6]

Lastly, with respect to the customer misbehavior, Bryan recounts only an isolated and brief encounter with an admittedly rude and obnoxious customer which was immediately addressed by a manager and instances of customers videotaping Bryan's breasts and buttocks that were similarly addressed by management. Although not innocuous events, Bryan provides no evidence that the incidents were so severe, humiliating or physically threatening, particularly in light of the context in which they occurred, that individually or collectively they altered the conditions of her employment on an objective level. *See id.* More importantly, Bryan fails to offer any authority for the proposition that *customer* as opposed to employee conduct can subject an employer to Title VII liability in the absence of any evidence that the conduct was condoned or facilitated by the employer.

In sum, the evidence viewed in the light most favorable to Bryan, fails to demonstrate the existence of any factual issue as to whether the identified conduct was so severe or pervasive that it created an abusive working environment. Nonetheless, the Court next proceeds to consider

---

[6]In fact, with respect to the t-shirts, there is no evidence that Bryan was ever asked or required to wear the t-shirt or that any server who did wear the t-shirt found it objectionable.

17

whether Bryan's claim, if legally sufficient, would be barred by the *Faragher* affirmative defense.

### 3. *Faragher Affirmative Defense*

#### a. *Tangible Employment Action*

As an initial matter, the Court notes Bryan's argument that the *Faragher* affirmative defense is unavailable because Hooters subjected Bryan to tangible employment action.  *See Faragher*, 524 U.S. at 807 (noting that an employer may raise an affirmative defense when no tangible employment action is taken).  Specifically, Bryan contends that the denial of the preferred shift assignments to her constitutes the tangible employment action sufficient to preclude Hooters' interposition of the *Faragher* affirmative defense.  However, "tangible employment actions," within the meaning of *Faragher*, are only those actions that result from actionable harassing conduct.  *See Burrell v. Star Nursery, Inc.*, 170 F.3d 951, 956 (9th Cir. 1999)(noting that a defendant may invoke the *Faragher* affirmative defense if the alleged sexual harassment did not culminate in the plaintiff's termination or other tangible employment action).  As explained above, Bryan has not produced evidence that Hooters managers gave the better shifts to Bryan's co-workers for any actionable reason.  Therefore, the preferential shift assignments, assuming they occurred, do not prevent Hooters from relying on the *Faragher* affirmative defense.[7]

---

[7]Bryan makes a passing argument that the *Faragher* affirmative defense also is unavailable with respect to Upchurch's conduct because Upchurch is so high in the Hooters corporate organization as to be the company's "proxy."  In support, Bryan points to William Becker's reference to Upchurch as a "partner" in the Hooters Bayside restaurant.  Becker Depo. at 13.  However, the remainder of Becker's deposition testimony clarifies that Upchurch's "partnership" involves only stock options, or more specifically, entitlement to a percentage of the profits in Hooters at Bayside, the restaurant location he initially managed. Id. at 13, 16.  In fact, a number of the managers are given a percentage of the profits of the Hooters locations that they

### b. *Elements of the Affirmative Defense*

To successfully interpose the affirmative defense, Hooters must demonstrate: 1) that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and 2) that Bryan failed to take advantage of any preventive or corrective opportunities provided by the employer. *See Faragher*, 524 U.S. at 807; *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1296-97 (11th Cir. 2000). Hooters has satisfied both elements of the defense.

With respect to the first element, it is undisputed that Hooters promulgated a sexual harassment policy and complaint procedure and disseminated it to its staff, including Bryan. *See Madray*, 208 F.3d at 1297-1300 (finding compliance with the first element by promulgating an anti-harassment policy). It is also undisputed that Hooters promptly addressed objectionable conduct of which it was made aware. Specifically, within two weeks after Bryan's March 1998 letter, Upchurch was transferred to another Hooters restaurant. Additionally, the t-shirts were removed from Hooters' merchandise and, within a week of commencing their sale, the comic books were discontinued. Finally, although Bryan stated otherwise in her March 1998 letter, Bryan testified that a manager intervened each time she complained of objectionable videotaping and when she reported the incident of the customer asking her whether she was wearing underwear, the manager told the customer to leave.

---

manage. Id. at 15. The record does not contain any evidence that Upchurch is an officer, director or so high in the management hierarchy that his acts should be considered the acts of the corporate defendant. *Cf. Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 265 (5th Cir. 1999)(explaining that liability may be fastened on the employer for the acts of its official who "is indisputably within that class . . . who may be treated as the organization's proxy, like the corporate president"); *Katz v. Dole*, 709 251, 255 (4th Cir. 1983)("Except in situations where a proprietor, partner or corporate officer participates personally in the harassing behavior, the plaintiff will have the additional responsibility of demonstrating the propriety of holding the employer liable under some theory of respondeat superior.")

Bryan argues, however, that Hooters did not exercise reasonable care because its sexual harassment policy did not prohibit managers from having consensual sexual relationships with subordinates or prohibit preferential treatment based on such relationships. As explained above, however, preferential treatment based on consensual sexual relationships alone does not constitute actionable sexual harassment. Consequently, Hooters "failure" to address or prevent such conduct does not tend to show that Hooters did not exercise due care in the promulgation or implementation of its policy, and therefore does not deny Hooters the benefit of the affirmative defense.

Hooters also relies on the second element of the affirmative defense to defeat Bryan's claim, to the extent that it is based upon Pemberton's and Engle's alleged misconduct, by arguing that Bryan unreasonably failed to report their allegedly harassing behavior. *See id.* at 1301 ("While proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the [affirmative] defense.")(quoting *Faragher*, 524 U.S. at 807-08). Bryan does not dispute that she never reported Engle's comments about her breasts or his attempts to hug and kiss her during afterwork outings or Pemberton's calls to her home and request for a date. Rather, Bryan argues that her failure to report this conduct was not unreasonable because she was afraid Upchurch would fire her.

Bryan's argument in this regard simply has no support in the record. The uncontroverted evidence is that Engle's and Pemberton's conduct took place prior to Bryan's March 1998 letter in which Bryan complained about Upchurch's behavior but not Engle's or Pemberton's behavior.

Obviously, no rationale factfinder could conclude that Bryan reasonably decided not to complain about Engle's and Pemberton's conduct based on a fear that *Upchurch* would fire her when she readily complained about Upchurch to Lageschulte. *See Madray v. Publix Supermarkets*, 30 F.Supp.2d 1371, 1375 (generalized fear of repercussions cannot form the basis for an employee's failure to complain).

In sum, the Court agrees that Hooters has successfully interposed the affirmative defense established in *Faragher*. Accordingly, the Motion will be granted as to Bryan's hostile work environment sexual harassment claim.

### II: Retaliation

Bryan also asserts a claim for retaliation. *See Sullivan v. National R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999)(a plaintiff's failure to establish a *prima facie* case of sexual discrimination is not fatal to the plaintiff's retaliation claim). Specifically, Bryan contends that she was given undesirable shift assignments in retaliation for her complaints to Ballard and Lageschulte in March 1998 and she was fired in retaliation for the complaints she voiced at the May 1998 staff meeting.

To establish a *prima facie* case of retaliation, Bryan must establish that: 1) she engaged in statutorily protected conduct; 2) she suffered an adverse employment action; and 3) a causal relationship exists between the two events. *Meeks v. Computer Associates Int'l*, 15 F.2d 1013, 1021 (11th Cir. 1994); *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998).

### A. March 1998 Complaints & Undesirable Shift Assignments

With respect to retaliation for her March 1998 complaints to Ballard and Lageschulte,

Bryan claims that thereafter she was denied the more lucrative bar assignments and was assigned increased hostess shifts. However, the record is undisputed that in response to her March 1998 complaints, Brawner ordered Pemberton to begin scheduling Bryan for additional bar shifts and that Pemberton complied. Moreover, in late April 1998, Bryan told Brawner that Hooters had satisfactorily responded to her complaints concerning her shift assignments and she had no other problems. Similarly, the record is clear that from April 1998 until her termination in May 1998, Bryan continued to receive bar shifts and was assigned to only one hostess shift. *See* Exhibit 10 to Def. App. Thus, Bryan's contention that she suffered retaliation for her March 1998 complaints is without merit.

### B. May 1998 Complaints & Termination

With respect to retaliation for her complaints at the May 1998 staff meeting, Bryan specifically contends that she was fired in retaliation for her attempts to complain at the staff meeting about managers affording preferential shift assignments to servers with whom they were having sexual relationships. Hooters argues that Bryan's complaint of preferential paramour treatment fails to satisfy the first element of a *prima facie* case of retaliation because Bryan did not have a good faith, objectively reasonable belief that she had been subjected to unlawful sexual harassment and thus had not engaged in protected conduct. Hooters further argues that even assuming Bryan's complaint was protected conduct, Hooters had a legitimate, non-discriminatory reason for terminating her and Bryan has failed to establish that the reason was pretextual. While the Court does not agree that the record establishes that Bryan did not have a good faith, objectively reasonable belief that she had been subjected to actionable sexual harassment, the Court does find that the record fully supports Hooters' claim that it had a

22

legitimate reason for terminating Bryan and that Bryan has failed to demonstrate that the reason was pretextual.

In this regard, once a *prima facie* case for retaliation has been demonstrated, the burden shifts to the employer to rebut the presumption of retaliation by offering legitimate reasons for its adverse employment action. *See Sullivan v. National R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999); *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997)(noting that the defendant's burden is "exceedingly light"). If the employer offers legitimate reasons, the employee must then show that the proffered reasons for the adverse action were a pretext for prohibited, retaliatory conduct. *See Sullivan*, 170 F.3d at 1059. An employee may satisfy this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Taylor v. Runyon*, 175 F.3d 861, 867 (11th Cir. 1999).

Hooters has articulated several legitimate, nondiscriminatory reasons for terminating Bryan: 1) her disruptive behavior at the staff meeting and failure to report her complaints to Brawner despite his express instruction to do so; 2) her refusal to speak with Brawner after the staff meeting; and 3) a history of poor work attitude, for example, being rude to customers and engaging in an altercation with a co-worker. Bryan argues that the reasons are pretextual because: 1) she believed the staff meeting was to discuss sexual harassment issues; 2) she did not refuse to speak with Brawner after the staff meeting; and 3) Hooters management had decided not to fire her for her prior problems with customers and co-workers.

With respect to her first argument, Bryan seeks only to exculpate her bad behavior by arguing that she was mistaken about the purpose of the meeting. However, Bryan's belief

23

concerning the purpose of the staff meeting is irrelevant. *See Jones v. Winn Dixie Stores, Inc.*, 75 F.Supp.2d 1357, 1365 ( S.D. Fla. 1999)(finding plaintiff's argument that she was not at fault in several of the incidents of insubordination irrelevant because the relevant focus is on the employer's perception of the plaintiff). What is relevant is the fact that Bryan does not dispute that she in fact disrupted the meeting by persisting to voice her complaints even after she was advised not to do so. Similarly relevant is the fact, which is uncontested, that she violated Brawner's instruction to report her complaints directly to him. Accordingly, Bryan has failed to demonstrate the existence of any genuine issue with respect to Hooters' assertion that she was terminated due to her disruption of the staff meeting.

With respect to her second argument, Bryan's contention is merely that management's belief that after the meeting she refused to speak with Brawner was erroneous. This too is insufficient to establish pretext. Whether or not an employer is correct about an employee's insubordinate conduct is of no moment. "An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or no reason at all, as long as its action is not for discriminatory reasons." *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984).

With respect to her third argument, Bryan asserts that Hooters' decision to terminate her based on conduct for which it had decided only to reprimand her in the past establishes pretext. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)(stating that a plaintiff must demonstrate such weakness, implausibility, inconsistency, incoherence or contradiction in an employer's proferred reason that a reasonable factfinder could find it unworthy of credence). The undersigned disagrees. There is simply nothing discriminatory about a decision to fire an

24

employee for rudeness and insubordination, particularly when the employee has been reprimanded for engaging in such conduct in the past and then has engaged in additional rude behavior. *See id.* at 1543(noting that "federal courts do not sit to second-guess the business judgment of employers," particularly where the reasons underlying such judgment are ones that would motivate a reasonable employer). In sum, Bryan has failed to point to any evidence suggesting that Hooters' proffered reasons for terminating her are unworthy of credence or that a discriminatory reason more likely motivated the decision, much less played any role in the decision at all.

*III: Punitive Damages*

Finally, Hooters argues that it is entitled to summary judgment with respect to Bryan's claim for punitive damages. In light of the undersigned's finding that Hooters is entitled to summary judgment as to Bryan's sexual harassment and retaliation claims, the Court will grant summary judgment as to Bryan's claim for punitive damages as well. Accordingly, it is hereby

ORDERED AND ADJUDGED that Defendant's Motion for Summary Judgment is GRANTED.

DONE AND ORDERED in Chambers at Miami, Florida, this 29 day of June, 2000.

URSULA UNGARO-BENAGES
UNITED STATES DISTRICT JUDGE

copies provided:
counsel of record